SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,

v.

NORTHEASTERN FINANCIAL CORPO-
RATION, Robert K. Berry, Reginald M.
Bevan, Louis R. Dreyling & Co., Inc.,
Louis R. Dreyling, Fred Cimino and
Paul W. Cotton, Defendants.

Civ. A. No. 140–63.

United States District Court
D. New Jersey.

Jan. 17, 1967.

Llewellyn P. Young, by Bert L. Gusrae, David Y. Handelman and Judith G. Shepard, New York City, for plaintiff.

John H. Kelley, New York City, for Louis R. Dreyling & Co. Inc. and Louis R. Dreyling.

Samuel Cole, Jersey City, N. J., Irving Fliegler, New York City, for Fred Cimino.

Frank Metro, Newark, N. J., for Reginald M. Bevan.

## OPINION

AUGELLI, District Judge:

On February 18, 1963, plaintiff Securities and Exchange Commission (Commission) filed a complaint in this Court charging defendants with violations of several sections of the Securities Act of 1933 (1933 Act), 15 U.S.C.A. § 77a et seq., and the Investment Company Act of 1940 (1940 Act), 15 U.S.C.A. § 80a–1 et seq.

On the basis of the complaint and supporting affidavits this Court, on February 19, issued a temporary restraining order which, *inter alia*, prohibited the transfer or other disposition of Northeastern assets, and directed defendants to show cause why, pending a final determination of the action, a preliminary injunction should not be granted and a trustee appointed. Thereafter, on April 1, defendants Northeastern and Berry consented to the entry of a preliminary injunction as against them, and on May 8, the Court appointed a trustee for all the assets and properties of Northeastern. Defendant Cotton was never served with process in this case, and the action was eventually discontinued as to him.

At the several hearings which followed on the Commission's motion for a preliminary injunction against the remaining defendants Bevan, Cimino, Dreyling, and Dreyling, Inc., Bevan did not testify. Instead, he filed an affidavit in opposition to the motion in which he denied any wrongdoing on his part. After the hearings had been concluded, this Court decided that the Commission had established a sufficient *prima facie* case to warrant preliminary injunctive relief against said defendants for violation of section 17(a) of the 1933 Act, 15 U.S.C.A. § 77q(a), and by order dated February 14, 1964, enjoined these defendants from further violations pending a final determination of the action. See Opinion filed herein on November 7, 1963.

Following issuance of the preliminary injunction on February 14, 1964, defendants Berry, Dreyling, Dreyling, Inc., and Northeastern, by its trustee, have all consented to permanent injunctive orders which prohibit further violations of various sections of the 1933 Act and the 1940 Act. Defendant Cimino, by default, was permanently enjoined from further violations of certain sections of the 1933 Act. This left as the only remaining party, defendant Bevan, who opposes the entry of a permanent injunction against him.

**414**

Bevan contends there is no likelihood that any unlawful conduct will be repeated. He points out that all activity with respect to Northeastern operations ceased upon the filing of the complaint in this Court; that he has severed all relations with Northeastern following that event; and that he did not, at any time thereafter, attempt to sell any of the Northeastern stock owned by him. Moreover, says Bevan, there can be no more sales of Northeastern stock because all that had been issued to defendants and to others connected with Northeastern has been surrendered to the trustee appointed by this Court. Specifically, Bevan refers to the fact that he voluntarily surrendered all of his Northeastern stock, 5600 shares, to said trustee. This is not quite accurate. While there is some indication of a willingness on the part of Bevan to surrender his stock, the truth is that such surrender was effected in settlement of a claim asserted by the trustee in a lawsuit brought by him against Bevan and other officers and directors of Northeastern.

■ Bevan finally contends that to permanently enjoin him at this time would create an "undisclosed hardship" and a "threat to his economic life". In this connection Bevan says that defendant Berry was the dominant and controlling figure in Northeastern operations, and that he, Bevan, was nothing more than "Mr. Berry's office boy, really". Bevan also claims that since Northeastern's involvement with the Commission, he has not made any stock deals or stock sales, nor has he associated himself with any brokers engaged in the promotion or sale of stocks. This, says Bevan, has resulted in loss of income, making him virtually penniless, since he possesses no savings or other property. This Court is asked by Bevan to take into consideration that he is "well on in years"; that the only ability he has is to work as a "clerk" in some brokerage house; and that to deny him this opportunity "at this late date in his life and saddle him with the stigma of [a]

permanent injunction would be a cruel and undeserving burden".

■■ One can well sympathize with the predicament in which Bevan finds himself. The factors urged by him in opposition to the grant of a permanent injunction, while deserving of some consideration, are not, standing alone, relevant in this type of a case. See Securities and Exchange Commission v. Cohn, 216 F.Supp. 636, 639 (D.N.J.1963). The factors considered by a court in the grant or denial of injunctive relief in traditional equity litigation between private parties differ somewhat from those considered in a statutory action for injunctive relief brought in the public interest. See Bradford v. Securities and Exchange Commission, 278 F.2d 566 (9 Cir. 1960). As stated by Professor Loss, in Securities Regulation, Vol. III, p. 1979 (2nd Ed. 1961):

> "Since SEC injunctions are creatures of statute, all that must be established is what the statute requires, without reference to proof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction."

■ Upon a proper showing being made, an injunction may issue regardless of the *mala-fides* or *bona-fides* of a defendant, and regardless of a defendant's cessation of illegal conduct if the likelihood of the resumption of such conduct is found to exist. The likelihood of future violations must be viewed in light of past conduct. A defendant's disclaimer of any intention to continue the illegal practices sought to be enjoined does not, *ipso facto*, make the case moot. Such disclaimer is but one of the factors to be considered in determining whether or not an injunction should issue against the discontinued acts. See Securities and Exchange Commission v. Cohn, supra; Securities and Exchange Commission v. Okin, 139 F.2d 87 (2 Cir. 1943); Securities and Exchange Commission v. Culpepper, 270 F.2d 241 (2 Cir. 1959); Securities and Exchange Commission v. Keller Corporation, 323 F.2d 397 (7 Cir. 1963).

In the opinion filed in this case on the Commission's motion for a preliminary injunction, this Court found that:

"Bevan was employed as a securities salesman by Dreyling, Inc. from April to July, 1961, during which period he made a number of sales of Northeastern stock to the public. From July to August of 1961 and from January 1962 to the time of the commencement of this action, Bevan, in addition to being a stockholder and director of Northeastern, also served as its president, vice-president, secretary and chairman of the board of directors. His salary, while connected with Northeastern, was in excess of $5,000.00 a year. Despite Bevan's assertion that he was nothing more than a figurehead in Berry's schemes and that he exercised no control in Northeastern affairs, other than to manage the office, the proofs are to the contrary and indicate that Bevan played an active role in assisting Berry in the management and business activities of Northeastern."

At the hearing held on the Commission's motion for a permanent injunction, the additional proofs adduced more fully established Bevan's activity in furtherance of Northeastern's business. The "office boy" image sought to be created failed to materialize. It appears that Bevan would visit plants and locations in which Northeastern contemplated making investments and report thereon to his fellow directors. He participated in policy decisions regarding Northeastern operations, including the employment of underwriters to sell Northeastern shares of stock to the public. As early as May 31, 1962, as appears from the minutes of a meeting of Northeastern directors held on that date, Bevan knew that the Commission was conducting an investigation of companies making intrastate offerings of stock to the public, and that Northeastern and its underwriters were included in that investigation. At that same meeting it was reported that 13,000 shares of Northeastern stock had

been sold, and another 40,000 shares remained available for sale.

At a meeting of the Northeastern directors held on June 28, 1962, it was Bevan who made the motion, adopted unanimously by his fellow directors, that Northeastern be authorized to conclude a contract extending a $100,000.00 line of credit to Delta Instrument Company, under specified terms and conditions. At this same meeting, it was also decided to retain special counsel in connection with the investigation of Northeastern affairs then being conducted by the Commission. Also at this meeting, defendant Dreyling, Inc. was designated as the exclusive underwriter for the sale of Northeastern stock. A tentative Profit and Loss Statement read at this time indicated a loss of approximately $26,000.00 for the first 6 months of Northeastern operations for the year. At the August 9, 1962 meeting of Northeastern directors, Bevan being present, a report was made on the closing of the contract with Delta Instrument Company. The contract on behalf of Northeastern was signed by Bevan as Vice-President. It was also decided at this time to cut off the public offering of Northeastern stock at $3.00 a share, and to offer to the public, through the exclusive underwriter, Dreyling, Inc., 51,000 Northeastern shares at $4.00 a share. The underwriter's president, defendant Dreyling, later reported, at a meeting held on October 3, 1962, that about 5,000 shares of the new $4.00 stock had been sold, and that he was hopeful the underwriting would be completed before the end of the year.

The several brochures, to which specific reference is made in this Court's opinion previously filed herein, are further evidence of Bevan's active participation in the affairs of Northeastern. The several matters contained in said brochures, which were replete with misrepresentations, all had their origin in the matters discussed and passed upon by Bevan and his fellow directors of Northeastern. The brochures identified Bevan as an officer and director of

Northeastern, and gave his business background as, "Investments—Plant Management". One brochure stated that Bevan was associated with a New York Stock Exchange firm, and that he had been in the securities business for 25 years. The truth of this statement was not challenged, but it is set forth here for the purpose of placing in proper focus, Bevan's relationship and activity in connection with Northeastern operations.

■ In view of all of the foregoing, it is difficult to conclude that Bevan was less culpable than his co-defendants. This Court is satisfied that Bevan participated in, and aided and abetted, violations of the federal securities laws in connection with the offer, sale and purchase of Northeastern stock. No registration statement was ever filed with the Commission with respect to the shares of Northeastern stock sold to the public. No attempt was made by Bevan or other responsible officers of Northeastern to register the corporation as an investment company under the 1940 Act. This is sought to be justified on the basis of a legal opinion that advised no registration was necessary because of the intrastate character of Northeastern operations. Shares of Northeastern stock are still in the hands of the public. Bevan hopes to again become employed as a "clerk" with some brokerage house. In the opinion of this Court, the evidence that prompted the grant of a preliminary injunction, when considered together with the evidence adduced at the hearing of October 18, 1965, warrants a finding that there exists the likelihood of a resumption of illegal conduct, and that under the circumstances a permanent injunction should issue.

■ It does not follow from what has been said that the Court attributes any wilfulness to Bevan's conduct. The Court is willing to accept Bevan's protestations that the violations were not wilful. But it must be remembered that the overriding consideration is the protection of the investing public. The injunction herein granted is not intended to be punitive. It does not seek to prevent Bevan from engaging in the securities business. In the public interest, the injunction is merely intended to prevent any future violation of the federal securities laws as specified in the injunctive order. If, in fact, there is no intention to commit future violations, the injunction can cause no harm. The injunction to be entered against Bevan shall be the same, as to scope and extent, with appropriate changes, as the one entered against defendant Berry.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Counsel for plaintiff will submit an order, in conformity with this opinion, on notice to counsel for Bevan, or an order consented to as to form by said counsel.