**SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff,**

v.

**RESCH–CASSIN & CO., INC., et al.,
Defendants.**

No. 71 Civ. 541.

United States District Court,
S. D. New York.

May 21, 1973.

Paul Chernis, Dennis J. Block, Marc N. Epstein, Kevin Thomas Duffy, Regional Administrator, New York City, for plaintiff.

Morton S. Robson, Stanger & Robson, New York City, for defendants.

## OPINION

TENNEY, District Judge.

Plaintiff, Securities and Exchange Commission (hereinafter the "Commission"), has applied for a permanent injunction enjoining Nagler-Weissman & Co., Inc. (hereinafter "Nagler-Weissman"), Robert Nagler (hereinafter "Nagler"), Adolph Weissman (hereinafter "Weissman") and Maxwell Forster (hereinafter "Forster") from further violations of the anti-fraud and anti-manipulation provisions of the Securities Act of 1933 (hereinafter "Securities Act") and the Securities Exchange Act of 1934 (hereinafter "Exchange Act"), and also from further violations of the net capital and bookkeeping provisions of the Exchange Act. The background of this litigation is the public offering of the stock of Africa, U.S.A., Inc. (hereinafter "Africa").[1]

---

1. On February 5, 1971, the Commission filed its complaint in this action. An order to show cause was made returnable on February 8, 1971, and on that date, Judge Inzer B. Wyatt signed an order, on consent, temporarily restraining defendants Resch-Cassin & Co., Inc., George Resch and Michael Cassin from further violations of the anti-fraud, net capital and bookkeeping provisions of the securities laws and freezing the assets of Resch-Cassin. Defendant Africa consented on February 17, 1971, to the entry of a Final Judgment of Permanent Injunction in this action. On the same date, Judge Wyatt heard argument on the Commission's motion seeking a preliminary injunction against the remaining defendants. On March 11, 1971, an order of preliminary injunction was entered enjoining Resch-Cassin, Resch and Cassin from further violations of the bookkeeping, net capital, anti-fraud and anti-manipulation provisions of the Securities Act of 1933 and the Securities

Exchange Act of 1934. The Court also appointed a receiver for the assets of Resch-Cassin. On the same date, Nagler-Weissman, Nagler and Weissman were preliminarily enjoined from further violations of the bookkeeping and net capital provisions of the Exchange Act and from further violations of the anti-fraud provisions, involving the failure of Nagler-Weissman to disclose the existence of the aforementioned violations to customers of the firm. No receiver was appointed for the assets of Nagler-Weissman due to the fact that on December 18, 1970, the company filed a petition for an arrangement pursuant to Chapter XI of the Bankruptcy Act. Findings of Fact and Conclusions of Law were issued as well by Judge Wyatt and these were subsequently modified on March 23, 1971. Judge Wyatt determined that a hearing would be needed on the question of whether the defendants manipulated the market in Africa stock. On April 13, 1971, the Commission made

## Facts

It appears that in the summer of 1970, Africa, a Delaware corporation located in Fillmore, California, registered 150,000 shares of its stock with the Commission for sale to the public at $10 per share on a "best efforts, all or none" basis. The underwriter for the offering was Resch-Cassin & Co., Inc. (hereinafter "Resch-Cassin"). The registration statement was made effective by the Commission on October 21, 1970, and under the terms of the offering all 150,000 shares had to be sold within 60 days or the funds would be returned to the subscribers. Prior to the effective date of October 21, 1970, Resch-Cassin had engaged in efforts to sell the Africa issue. As part of this effort, a selling group was formed of which Yarnall-Biddle, Andresen & Co., New Dimension Securities, Pasternack Securities and Nagler-Weissman were members. Nagler-Weissman originally agreed to distribute 15,000 shares, which later was increased to 17,500 shares. The principal inducement employed by Resch-Cassin in building interest in the stock focused on the anticipated after-market price. For example, Solon Patterson of the Alpha Fund of Atlanta, Georgia, which purchased 10,000 shares, was told both orally and in writing by defendant George Resch, Jr. (hereinafter "Resch") that the after-market price was expected to be well over $20 per share and increased its order on the basis of this representation; Irby Bright, vice president of the First American National Bank in Nashville, Tennessee, which also purchased 10,000 shares, was told by defendant Michael Cassin (hereinafter "Cassin") that the after-market price would be at least $22 per share.

On Friday, October 23, 1970, trading commenced in Africa stock. Resch-Cassin, however, was having severe difficulty in completing the underwriting.[2] Yarnall-Biddle, a member of the selling group, indicated prior to October 21, 1970, that it wanted 2,500 shares but cancelled this order shortly thereafter. It subsequently purchased 8,500 shares —on October 30, 2,500 shares; November 11, 1,500 shares; and November 13, 4,500 shares—at a time when the stock was trading at levels above the $10 offering price and still prior to the closing of the original offering.

It was, of course, crucial to Resch-Cassin that the after-market open at a premium in order to fulfill the promises made to Bright and Patterson and in order to induce purchasers such as Lloyd Zeiderman (hereinafter "Zeiderman") and Yarnall-Biddle's customers to buy the unsold portion of the issue. Zeiderman and Leo Kolack, partners of Kaufman, Kolack & Co., financial advisers and accountants for Africa, purchased

a motion seeking to have a date set for the commencement of an evidentiary hearing.

Defendants Resch-Cassin, Resch and Cassin consented on May 5, 1971, to the entry of a Final Judgment of Permanent Injunction in this action. In order to resolve the issues of fact raised by defendants Nagler-Weissman, Nagler, Weissman and Forster, a hearing pursuant to Fed.R.Civ.P. 65 was ordered. Upon consent of all parties and pursuant to Fed.R.Civ.P. 65 (a) (2), the Court ordered the trial of the action on the merits to be advanced and consolidated with the hearing of the Commission's application for a preliminary injunction.

2. The defendants contend they had no knowledge either of the difficulties Resch-Cassin was encountering in securing the funds or of the promises Resch and Cassin made to prospective purchasers relating to the after-market price of the Africa stock. They claim they believed that the issue was oversold and, in addition, that there was a huge demand for the stock in the after-market. Yet Forster testified before the Commission that Cassin had admitted to him that the document he had given to Forster to support such a claim was inaccurate, and as will appear, Forster received no calls from brokers or customers interested in purchasing the stock although he was the prime market-maker. Moreover, in October and November 1970 Forster and Weissman were in the offices of Resch-Cassin on a daily basis.

15,000 shares through the Bank of New York on the effective date, October 21, 1970. Subsequent to this purchase, Zeiderman attended four or five abortive closings starting on November 13, 1970, at each of which funds to close the issue were unavailable. In order to establish the price at the desired level, on Friday, October 23, 1970, Resch asked Peter Lewitin (hereinafter "Lewitin"), a trader at Smith, Jackson & Co., Inc. (hereinafter "Smith Jackson"), to trade the Africa stock, and Resch-Cassin gave Lewitin an order to buy 3,000 shares at $20 per share. As a result of this order, Lewitin made his "pink sheet"[3] market at $18 bid and $21 asked. At the same time other brokers were also trading in Africa stock. Among these were Mandelbaum Securities (hereinafter "Mandelbaum") and A. P. Montgomery & Co., Inc. (hereinafter "Montgomery"). The trader at Mandelbaum, Jeffrey Greenstein (hereinafter "Greenstein"), learned about Africa stock from Lewitin and, after meeting with Resch and Cassin, decided to trade. At approximately noon on October 23, 1970, Greenstein received a call from Lewitin who informed him that the stock was "ready for trading" and that his market was $18–$21 by reason of the buy order for 3,000 shares at $20 referred to above. Lewitin also informed Greenstein that Greenstein could sell him at $19¾ any stock he was able to purchase. Therefore, Greenstein's opening quote for Africa was also $18–$21.

During the first day of trading, October 23, 1970, both Lewitin (Smith Jackson) and Greenstein (Mandelbaum) received only sell orders for Africa stock.[4] As a result of large sell orders and lack of demand for Africa stock, they both continued to buy Africa stock, each time lowering their market, so that Lewitin quoted the stock as low as $14 bid, and Greenstein bought stock at as low as $14. Although Lewitin had limited experience he realized that there was something wrong with the way the stock was trading, and discontinued his efforts after only a half-hour or forty-five minutes, during which time the bid price had dropped from $18 to $14. He also had some apprehension about Resch-Cassin's ability to pay for the $60,000 worth of Africa stock they had ordered from Smith Jackson. Richard Friedman (hereinafter "Friedman"), president of Montgomery and an expert in the new issue field, noted very little public demand, his opening being based on the market of $18–$21 established by Lewitin (Smith Jackson). Since the latter was supplying most, if not all, of the demand for Africa stock, Lewitin's decision to stop trading the issue, together with the absence of any other demand, caused the market for the stock to collapse; by the close of the market on Friday, October 23, 1970, it was selling at the $11 level.

On Tuesday morning, October 27, 1970, the pink sheets reflected prices of $9½ to $11 and $9 to $12 with only two market-makers in the sheets. Unless Resch-Cassin wanted to abandon the Africa underwriting and return whatever funds had been raised to the subscribers, a trader had to be found who could establish and maintain the price of Africa stock at a sufficient premium to induce the public to purchase the unsold portion of the issue at the $10 offering price stated in the prospectus. Therefore, on either Monday, October 26, or Tuesday, October 27, Resch approached defendant Forster, the trader for Nagler-Weissman, and asked him if Nagler-Weissman would become a market-maker in the Africa stock. Resch had

---

3. Most brokers and dealers subscribe to the service of the National Quotation Bureau, Inc., a private organization which publishes and circulates each day among its subscribers loose-leaf sheets, "pink sheets", which contain quotations as to over-the-counter securities inserted for that day by subscribers.

4. Defendants claim they were ignorant of the Smith-Jackson and Mandelbaum trading. Yet Forster was told by Resch that a problem had developed with Smith-Jackson and Forster was unsuccessful in getting an explanation from Lewitin.

had prior dealings with Forster in a security called Systems Liaison. Forster had been anxious to trade the Africa stock and, furthermore, Resch-Cassin shared offices with Nagler-Weissman, which would minimize the chances of any misunderstandings arising in the trading and would enhance Resch-Cassin's ability to control it. Before Forster agreed to become a market-maker in Africa, however, he discussed the situation with Weissman who gave his approval. On Monday, October 26, trading in Africa stock had been slight with only 1,100 shares traded and these all purchased by Montgomery at prices ranging from $10 to $11 per share. By the next morning, Tuesday, October 27, trading activity decreased even further. Between the opening of the market at 10:00 A.M. and 1:00 P.M. there were only two trades: at 11:18 A.M. Hornblower & Weeks-Hemphill Noyes bought 100 shares at $11 from Montgomery, and at 12:16 P.M. Montgomery bought 100 shares at $10½ from Pasternack Securities. Thus, as of the morning of October 27, 1970, the price of Africa stock remained depressed.

Resch followed the same pattern he had with Smith Jackson by giving Nagler-Weissman a purchase order on October 27, 1970, this time for 1,000 shares of Africa stock for the account of Elsie Himes, a customer of Resch-Cassin. In fact, Mrs. Himes had ordered only 500 shares from Resch-Cassin.[5] Resch-Cassin turned this customer order over to Nagler-Weissman and gave up the commission. With this order, Forster (Nagler-Weissman) could go into the market to buy Africa stock.

Starting at 1:14 P.M. on October 27, 1970, Forster made his first trade in Africa stock, purchasing 100 shares at $11 from Associated Investors. Following this transaction, he continued to buy the stock and between 1:16 P.M. and 1:50 P.M. he purchased 900 additional shares at prices ranging from $11½ to $16, the final price. Thus he moved the price from $11 to $16 in 34 minutes. All but 300 shares of the 1,000 were purchased from Montgomery, Forster always purchasing at the price offered by Montgomery without attempting to negotiate a better price. Indeed, only two minutes after Forster purchased 300 shares from Montgomery at $16, the latter was able to purchase 200 shares at $14 per share. Furthermore, Forster did not need the stock quickly. Although Resch told Forster that he wanted a good price for the stock, he gave no instructions as to time, nor were there any special instructions from the customer, Mrs. Himes.

On the morning of Tuesday, October 27, 1970, there were only two brokers, Montgomery and Associated Investors, quoting Africa in the pink sheets. The next day there were five. From then until the beginning of December Associated Investors, Nagler-Weissman, M. H. Meyerson (hereinafter "Meyerson") and Axelrod & Co. (hereinafter "Axelrod") consistently quoted the stock in the pink sheets. In addition, Montgomery was in the sheets until the middle of November, and Austin James & Co. and Martin-Joel commenced to quote Africa stock from the middle of November onward. On October 28, the day after the Himes order was filled, Nagler-Weissman appeared for the first time in the pink sheets on Africa stock with a quote of $15–$17. On this date, the other market-makers in the sheets were Montgomery, $14–$16; Associated Investors, in name only; Budin Phillip S & Co., in name only; and Grimm & Davis, $10,–$12. Although Nagler-Weissman's bid price for Africa stock was $15, the highest price it paid on this date was $14 a share. On October 29, when Nagler-Weissman appeared in the pink sheets at $15–$17, the other market-makers were Montgomery, $12–$14; Associated Investors, $11–$14; and Dominick & Dominick, Inc., $13–$15. Again, although its bid price was $15, Nagler-Weissman paid a high of $14. Despite the fact

---

5. *It is interesting to note that Forster never communicated with Mrs. Himes, so the error was not corrected.*

that Nagler-Weissman was the high bidder on October 28 and 29, it made no sales of Africa to anyone on these days. During the five trading days from October 30 through November 5, Nagler-Weissman was the high bidder on each day in the pink sheets on Africa stock, and on each day that it traded during that period the high price that it paid was below its quoted bid price.[6]

Nagler-Weissman was responsible for Meyerson and Axelrod being in the sheets in Africa since Forster had asked them to enter.[7] Axelrod's first quote for Africa stock was on November 4, 1970, although Meyerson commenced quoting from October 30, 1970. It is interesting to compare the quotes when all three were in action:

| Date | Nagler-Weissman | Meyerson | Axelrod |
|------|-----------------|----------|---------|
| 11/4 | 13–14 | 12–14 | 12–13½ |
| 11/5 | 12½–14 | 12–13½ | 12–13 |
| 11/6 | 12–13 | 11½–12½ | 11¾–12¾ |
| 11/9 | 12–13 | 12–13 | 11¼–12¼ |
| 11/10 | 12¼–13¼ | 11½–12½ | 12–13 |
| 11/11 | 14–15 | 13½–14½ | 14–15 |
| 11/12 | 15–16 | 15–16 | 14½–15½ |
| 11/13 | 16½–17½ | 16¼–17¼ | 15½–16½ |
| 11/16 | 17–18 | 16–17 | 16½–17½ |
| 11/17 | 17–18½ | 17–18 | 17–18 |
| 11/18 | 17½–18¼ | 17½–18½ | 17–18 |
| 11/19 | 17½–18¾ | 17–18 | 17–18 |
| 11/20 | 17½–18½ | 17–18 | 17–18 |
| 11/23 | 17½–18½ | 17–18 | 17–18 |
| 11/24 | 17½–18½ | 17½–18½ | 17–18 |
| 11/25 | 15½–17½ | 14½–15½ | 17–18 |

On each day either Meyerson or Axelrod would quote the stock from ¼ to 1 point below Forster's bid. As Forster's bids became higher, they followed suit. Over a period of 25 trading days from October 22, 1970, on 17 days Nagler-Weissman had the high bid in the pink sheets, and on 5 other days it equalled the high bid. On the offer side, Nagler-Weissman was high on 8 days and equal to the high offer on 7 other days.

Despite the "activity" created by Forster (Nagler-Weissman) there was, in fact, a lack of interest in purchasing Africa stock both by the public and by other broker-dealers throughout October,

6. Defendants advance two reasons to refute the charge of manipulation based on Nagler-Weissman's consistently being the high bidder in the pink sheets. First, that being high bidder was necessary in order for it to compete with other brokerage houses, since it was a small broker. Between October 23, 1970, and November 24, 1970, however, Nagler-Weissman was the only buyer of substance in the market, and there is no evidence as to with whom it was competing. The other reason advanced, i. e., that the fact that Nagler-Weissman was purchasing below its pink sheet quotations is indicative of a lack of manipulative intent, is, rather, evidence itself of manipulation since Nagler-Weissman was raising the bid price at a time when it was purchasing below the quoted price.

7. The close parallel between the pink sheet prices of Meyerson, Axelrod and Nagler-Weissman and the actual trading between these firms also compels the conclusion that Nagler-Weissman was responsible for the activities of Meyerson and Axelrod.

November and December, 1970. Records of the trading show that the only public buying between October 27, 1970, and November 23, 1970, was the following:

> October 27 – 1,000 shares (Elsie Himes' order)
> October 28 – 200 shares
> November 2 – 500 shares (of a total market of 4,000)
> November 9 – 400 shares (of a total market of 2,000)

---

Yet, during this period the stock traded at a premium, never falling below the $10 offering price. That this occurrence must be attributed to the aggressive campaign conducted by Nagler-Weissman seems clear. Between October 27 and December 7, 1970, Nagler-Weissman purchased a total of 36,600 shares of Africa. The aggregate of all other market-makers purchased a total of 31,400 shares. The public purchased 3,500 shares (including the 1,000 shares sold to Elsie Himes). The shares purchased by other brokers included 10,300 shares bought by Meyerson, of which Nagler-Weissman repurchased 8,165, and 2,900 bought by Axelrod, of which Nagler-Weissman in turn bought 2,850. Of the 36,600 shares purchased by Nagler-Weissman, a total of 33,065 shares were in turn sold to Resch-Cassin at higher prices, resulting in a gross (unrealized) profit to Nagler-Weissman of $23,915 or approximately 70 cents per share. These sales to Resch-Cassin were not pursuant to specific orders that Resch-Cassin had left with Nagler-Weissman, but Resch never refused to take a block of Africa stock offered to him by Forster. By virtue of its purchase of approximately one-half of the market between October 28, 1970, and November 10, 1970, Nagler-Weissman was able to control and maintain an orderly market. During this period, Nagler-Weissman purchased a total of 8,600 shares from $11½ to $14 while other brokers purchased 8,700 shares from $10¾ to $16. By November 10, 1970, the issue was supposedly preparing to close. On November 13, the contemplated closing date, Weissman advised Carlos Correa, who had purchased 2,500 shares of Africa stock from Nagler-Weissman at $10 per share, that he needed the money for this purchase due to the impending closing. When Correa could not produce the money, Weissman borrowed $25,000 to pay for the purchase.[8] This was an unsecured personal loan to Weissman with no co-signers. Forster also acquired a stake in the continued success of Africa, for on November 10, 1970, he purchased 1,300 shares in his wife's account at Nagler-Weissman at $12 and $12¼ per share, which shares he sold on November 24, 1970, at a profit. Although the November 13 closing date was aborted, it is interesting to note the activities of Nagler-Weissman immediately prior and subsequent to that date.

On November 11, it raised its quote in the pink sheets from $12¼ to $13–$14; on November 10, to $14–$15. On that date November 11, it purchased 1,500 of the 2,100 shares traded, the high purchase being $15¼ by Nagler-Weissman.

On November 12, it raised its quote to $15–$16 and purchased 100 shares at $15½, 100 shares at $15¾, and 100 shares at $16. On this same date other market-makers were purchasing Africa at $15, $15¼ and $15½.

On Friday, November 13, the anticipated closing date, it raised its quote to $16½ to $17½. The total trading in Africa stock was three 100 share purchases by it at prices of $16½, $17 and $17. Nobody else purchased Africa stock on this date.

8. A violation of Regulation T (12 C.F.R. Part 220 (1972)).

On Monday, November 16, the next trading day, it raised its quote to $17–$18 and bought 1,000 shares at prices ranging from $16½ to $18. The other market-makers bought 800 shares. With the exception of Resch-Cassin, no other broker paid more than $17.

On November 18, it purchased 1,600 shares in seven transactions, each purchase at $17¼, and on November 20, an additional 100 shares at the same price. Finally, on November 23, the date of the eventual closing, it purchased 1,550 shares of which 200 were bought at $17¾ and the remainder at $17¼.

During the three trading days from November 18 through November 20, the only purchasers of Africa stock were Nagler-Weissman, Axelrod and Meyerson. During this period Axelrod purchased 1,000 shares in ten separate transactions at $17 per share, and Meyerson purchased 900 shares in four separate transactions at $17 per share. Between November 18 and 23, Axelrod sold the 1,000 shares to Nagler-Weissman in five separate transactions at $17¼, and Meyerson on November 18 and 19 sold all 900 shares to Nagler-Weissman in four transactions, also at $17¼ per share. It is interesting to note that Carlos Correa, whose stock purchase had been funded by Weissman through a personal loan, also sold his stock to Nagler-Weissman at $17¼ and used part of the proceeds to repay Weissman's bank loan. Forster himself sold the stock he had purchased in his wife's account to Resch-Cassin, also at $17¼.

From November 20 through 24, Nagler-Weissman was the high bidder at $17½ per share. It is interesting to note that there had been several abortive closings between November 13, 1970, and the actual closing date on November 23, 1970, and that the closing took place only because Kaufman, Kolack & Co., the financial advisers and accountants for Africa (who had purchased 15,000 shares on October 21, 1970) purchased, on the strength of a $100,000 loan from the Bank of New York, 8,000 shares of original issue stock for their clients, and Zeiderman (a partner of Kaufman, Kolack) purchased 2,000 shares of original issue stock for himself, all on November 23, 1970, in order to provide the $100,000 necessary to close the issue.[9] Since the stock was trading around $17 per share, no risk was involved. Zeiderman testified that he would not have purchased this stock if it had been trading below $10 per share.

On November 24, Nagler-Weissman purchased 9,200 shares from its customers at $17¼ and 200 shares at $17, which enabled Forster to cover a short position that had been created on the previous day by selling 7,500 shares at $18½ to Resch-Cassin. All other purchases by Nagler-Weissman on November 24, 1970, were substantially lower prices ranging from $12⅛ to $15½.

Since the issue was closed and Nagler-Weissman had successfully sold out its customers at a profit, and since Forster and Weissman had disposed of their stock, on November 25 Nagler-Weissman dropped its bid price in the pink sheets to $15½ and thereafter appeared in the pink sheets in name only, with the exception of December 7, 1970 (which reflected a bid of $10 and offer of $12). By November 25, 1970, Nagler-Weissman was purchasing Africa stock at prices as low as $10 and $10⅛, although as of this date it was selling

9. Zeiderman sold 10,000 shares on the following day, November 24, 1970, out of the 15,000 purchased on October 21, 1970, and defendants intimate that this was the reason for the price decline, rather than the cessation of their manipulative activity. However, Zeiderman sold his shares directly to Resch-Cassin and thereafter the latter sold no shares of Africa into the market. Thus, the Zeiderman sale could have had no effect on the market price.

its purchases to Resch-Cassin at $12¾. The pink sheets also reflected the decline following the closing. The quotes are as follows:

| | 11/23 | 11/24 | 11/25 | 11/27 |
|---|---|---|---|---|
| Nagler-Weissman | 17½–18½ | 17½–18½ | 15½–17½ | N/O |
| Martin-Joel | 17–18 | 17¼–18¼ | 14–16 | 10–13 |
| H. H. Meyerson | 17–18 | 17½–18½ | 14½–15½ | 11–12 |
| Axelrod & Co. | 17–18 | 17–18 | 17–18 | N/O |
| Austin James & Co. | 17–18 | 17–18 | 14–16 | 10½–12½ |

———◆———

While Nagler-Weissman continued to submit quotes for Africa to the pink sheets from November 27 through December 9, 1970, except for December 7, these quotes were submitted in name only (N/O). The market hovered around the $10 level through December 3, but was very slight. On December 4, Nagler-Weissman sold 5,000 shares to Resch-Cassin at $11. The last transaction Nagler-Weissman had in Africa stock was on December 7 when it purchased 400 shares at $8 from Martin-Joel and 100 shares at the same price from Associated Investors, although it was quoting the stock at a bid price of $10 and an offer price of $12. By December 14, the stock was trading at the $4 level.

We now pass to the charges of a violation of the net capital and bookkeeping provisions of the Exchange Act. Over the period hereinbefore discussed, Nagler-Weissman had sold Resch-Cassin over 33,000 shares of Africa stock and had bought over 36,000 shares from other brokers on the expectation of payment from Resch-Cassin. Around December 1, 1970, Nagler-Weissman received two checks from Resch-Cassin in partial payment for stock purchased by Resch-Cassin. One check, in the amount of $100,000, was paid but the other, for $35,000, was returned by the bank two or three days later. Resch-Cassin issued another check for $35,000 but this, too, was returned by the bank. Resch-Cassin's apparent financial difficulty created financial problems for Nagler-Weissman. If Resch-Cassin was unable to pay its outstanding "fail to deliver" of approximately $250,000, Nagler-Weissman would be unable to pay its obligations without selling its inventory of Africa stock.

Therefore, on Sunday, December 6, 1970, a meeting was held at the offices of Nagler-Weissman. The night before the meeting, Weissman had telephoned Howard Kaufman and Ralph Helfer, the principals of Africa, in California, and told them that unless they came to the meeting he would go to the Commission. Present at the meeting were Weissman, Resch, Cassin, Kaufman, Helfer (president of Africa), Mr. Cassivio (attorney for Resch-Cassin), Zeiderman, Steve Weil (a potential source of funds), an attorney present at the request of Nagler-Weissman (never called as a witness by either party) and, during part of the meeting, Cassin's three brothers.

The first part of the meeting involved discussions among Weil, Kaufman and Helfer about construction loan possibilities for the issuer. A family meeting among Cassin and his three brothers took place in a room adjacent to the main meeting. Nagler-Weissman's attorney introduced himself and asked the Cassin brothers to attend the main meeting. At that meeting it was indicated that a National Association of Securities Dealers, Inc. ("NASD") inspection was due shortly which would reveal that Resch-Cassin was in violation of

the net capital rule and would be forced to discontinue operations. Kaufman was asked to contribute money to Resch-Cassin, as was the Cassin family. Nagler-Weissman's attorney stated that it would be necessary to find a "warm body" in Canada or somewhere outside of the United States and the jurisdiction of the Commission to whom a "sale" of Africa stock could be made and which sale, if made for delivery against payment, would allow extra time to find sources of financing to pay Nagler-Weissman the moneys owed for delivery of Africa stock. Such a "sale" also would give Resch-Cassin an "asset" enabling it ostensibly to stay within the net capital ratio and thus continue to operate as a broker-dealer. Of course, as long as Resch-Cassin stayed in business Nagler-Weissman could carry its "fail to deliver" to Resch-Cassin as an asset, but as soon as the latter failed the $250,000 receivable on Nagler-Weissman's books would be worthless, Nagler-Weissman would be out of capital ratio and would have to cease business. Weissman suggested Steve Schwartz as a name which could be used by Resch-Cassin on its books, and after calling Nagler, indicated that for record-keeping purposes delivery should be made to the Royal Bank in Canada.

Subsequently, Resch-Cassin recorded a sale of 25,000 shares of Africa to Schwartz at $15 per share on its books, backdating the transaction to December 2, 1970. This trade was a fictitious trade as far as Resch-Cassin was concerned, and it never sent out a confirmation of the sale. Schwartz was an individual Nagler had met at a brokerage house in Montreal, Canada, on one or two occasions, and had never been a customer of Nagler-Weissman. Except for Cassin's brothers, all those present at the meeting on December 6 knew the transaction to be a facade designed to conceal Resch-Cassin's financial difficulties.

That Nagler-Weissman, as well as Resch-Cassin, was out of capital ratio on or before December 6 seems self-evident. Yet, they did not close down until at least one week after they knew Resch-Cassin checks were bouncing. On Friday, December 11, 1970, when Stephen Mink, a Commission investigator assigned to inspect the books and records and analyze the financial condition of Nagler-Weissman, attempted to gain admittance to the offices of that firm, he found a sign on the door stating "closed due to illness". On the following Monday, December 14, Mink was able to gain admittance to the office where he found Nagler and Mr. Greenfield, the controller. The latter furnished Mink with a trial balance as of December 9, 1970, which reflected, among other things, a "fail to deliver" from Resch-Cassin in the approximate amount of $250,000. There were no supporting schedules and records to substantiate the control figures in the trial balance, and when Mink examined the "fail" records and the customers' individual ledger accounts, the figures were at wide variance with those prepared by Greenfield, which made it meaningless to attempt to ascertain the firm's capital position. However, based on the differences in the "fail to receive" and "fail to deliver" records, and in the customers' individual accounts, the fact that a 6,500 share position in Africa was reflected in the firm's trading account, although as of December 9, 1970, there was no pink sheet bid for this stock upon which any valuation could be based, and the further fact that Resch-Cassin was unable to accept deliveries thereby negating the use by Nagler-Weissman of this "fail to deliver" as an asset, Mink concluded that the firm was not in compliance with the net capital rule and that its books were inaccurate. Defendants do not dispute Mink's findings as of December 9, 1970, but maintain that there is no evidence to indicate that the firm's books and records were not adequate prior to December 8, 1970, and that the November 30, 1970, trial balance and supporting schedules indicated that its

books and records were current and its net capital ratio adequate on that date.

Violation of the Anti-fraud Provisions: § 17(a) of the Securities Act, 15 U.S.C. § 77q(a) (1970) and § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1970), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1971).

While there is little dispute as to the essential facts as hereinbefore set forth, there is a marked variance between the parties as to the inferences and conclusions to be drawn therefrom. It is the position of the defendants that the evidence adduced by the Commission fails to establish either that there was a manipulative scheme, the purpose of which was to inflate or maintain the price of Africa stock, or that if there was such a scheme, it was accomplished without the knowledge or participation of defendants Nagler-Weissman, Nagler, Weissman or Forster.

Section 10(b) of the Exchange Act makes it unlawful for any person, by the use of interstate commerce or of the mails:

"To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, *any* manipulative or deceptive device or contrivance. . . ." (Emphasis added.)

■ This prohibition with respect to manipulative activity is not confined to any particular kind of manipulation, but as more specifically defined in Rule 10b–5[10] is necessarily designed to outlaw every device "used to persuade the public that activity in a security is the re-

flection of a genuine demand instead of a mirage." 3 Loss, Securities Regulation, 1549–55 (2d ed. 1961). The Exchange Act does contain a section entitled "Manipulation of security prices", however, which defines "manipulation". This section, § 9(a)(2) of the Exchange Act, 15 U.S.C. § 78i (1970), makes it unlawful to use the facility of a national securities exchange

"[t]o effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange *creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.*" (Emphasis added.)

■ It is well settled that the manipulative activities expressly prohibited by § 9(a)(2) of the Exchange Act with respect to a listed security are also violations of § 17(a) of the Securities Act and § 10(b) of the Exchange Act when the same activities are conducted with respect to an over-the-counter security.

■ Since Rule 10b–7 of the Exchange Act, 17 C.F.R. § 240.10b–7 (1971), defines the term transaction as "a bid or a purchase", an alleged manipulator can be said to effect transactions in a security if he bids for it in the pink sheets or purchases it or sells it. In the instant case, Forster, acting on behalf of Nagler-Weissman, bid for Africa in the pink sheets for a period of 25 days, purchased some 36,600 shares from other brokers and members of the public, and sold some 33,065 shares to Resch-Cassin. Furthermore, defendants created both

10. Rule 10b–5 provides:
"*Employment of manipulative and deceptive devices.*

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) to employ any device, scheme, or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

"actual" activity and "apparent" activity in the trading of Africa stock. One of the indicia of apparent activity is the inducement of other broker-dealers to quote the security in the sheets, for the more frequently a security is quoted, or the greater the number of dealers quoting the security, the broader and more active the appearance of the market for that security. Forster was directly responsible for the pink sheet activity of at least two other brokers, Meyerson and Axelrod, since he asked them to enter the sheets. As already noted herein, there was a close interaction between these brokers and Nagler-Weissman during the period from November 4, 1970, when both Meyerson and Axelrod were in the sheets, and the date when the issue was finally closed, November 23, 1970. During this period Nagler-Weissman's bid quotes ranged anywhere from ¼ to 1 point higher than Axelrod's and Meyerson's. While on a few days the quotes were the same, it is only logical to infer that an agreement or understanding existed whereby Forster would set the pace, and, as Forster's bids became progressively higher, Meyerson and Axelrod followed suit. The rest of the market-makers followed the leaders. Forster also used Meyerson and Axelrod to create actual activity by having them purchase stock from other market-makers which stock, in turn, was sold to Nagler-Weissman. In this fashion Forster was able to create a portrait of an active market with a broad base of interested brokers and thereby to reassure the public, induce holders of Africa stock not to sell out, and make the undisposed of new-issue stock an attractive investment.

The insertion of increasingly higher bids for a stock in the sheets is an obvious device to create a false appearance of activity in the over-the-counter market and tends to support the price at an inflated level. As has already been noted, Forster's quoted bids for Africa stock in the pink sheets increased at the crucial times and the overall direction was upward. More importantly, Nagler-Weissman's bids were consistently higher than those of the other market-makers. Finally, Nagler-Weissman created actual activity in Africa stock through purchases in the over-the-counter market. As already indicated, Nagler-Weissman purchased over 36,000 shares of Africa from other brokers and the public, a fact of which other brokers were well aware. There can be little question that the aggressive buying campaign of Nagler-Weissman created actual activity and added to the overall appearance of apparent activity in the Africa stock.

■ Of course, § 9(a)(2) of the Exchange Act, as noted, makes it sufficient proof of manipulation if the manipulator caused either actual or apparent activity *or* caused a rise in the market price. It seems clear that Nagler-Weissman, through Forster, created both actual and apparent activity in Africa stock. It seems irrefutable from the evidence that between October 27, 1970, when Nagler-Weissman commenced trading, until the closing date of November 23, 1970, the public and independent brokers had to pay increasing prices to purchase the stock. On October 26, purchases of the stock in the over-the-counter market were made at $10, and on November 23 at $18. Moreover, from November 10 until November 23, the upward price movement was dramatic and uninterrupted. The same was true with respect to the range of bids and offers in the pink sheets.

■ Of course, once it is established that a price rise occurred, it becomes necessary to show that defendants caused it. There are various factors which characterize attempts by manipulators to raise the price of an over-the-counter security: (a) price leadership by the manipulator; (b) dominion and control of the market for the security; (c) reduction in the floating supply of the security; and (d) the collapse of the market for the security when the manipulator ceases his activity. As already discussed herein, the tactic of inserting successively higher bids in the pink sheets has the effect of giving an ap-

pearance of activity. However, it also has the effect of causing a price rise. Similarly, the use of actual purchases and sales at successively higher prices not only has the effect of giving an appearance of activity, it raises the price of the over-the-counter security. It is not necessary to review all the occasions when Forster artificially raised the price of Africa stock, but his actions on October 29, 1970, the first day he traded the stock, is a good example. Starting with his first purchase at $11, he bought in 100-share lots at ever increasing prices, culminating at $16 per share —and yet he was the only buyer in the market. During the four weeks commencing October 27, Forster constantly paid higher prices for Africa than the other market-makers, and on some days was the only bidder. On November 13, the date of the abortive closing, he bought at $17 although the market was $16 the day before and there was no competitive buying. During the period from November 18 to November 20, 1970, the only purchasers were Nagler-Weissman, Meyerson and Axelrod. Yet, every transaction by Meyerson and Axelrod was a purchase of Africa at $17 and a subsequent resale of these shares at $17¼ to Nagler-Weissman. In other words, to insure that a closing of the issue would occur, Nagler-Weissman "pegged" the price of Africa at $17¼ at a time when there was a total absence of public demand for the stock.

Moreover, the dominion and control of the market in Africa stock by Nagler-Weissman is clearly disclosed by the record. Between October 27 and December 7, 1970, Nagler-Weissman directly purchased 36,615 shares and indirectly caused the purchase of an additional 13,200 shares through Meyerson and Axelrod, a total of 49,815 shares and approximately two-thirds of the total market although there were 19 different broker-dealers in the pink sheets during this time period.

As already noted, another factor which characterizes attempts by manipulators to raise the price of an over-the-counter security is reduction of the floating supply of that security. In the instant case, when the after-market in Africa stock opened on October 23, 1970, no stock had as yet been distributed or delivered to the public who had purchased it in the course of the underwriting; the issue had not been sold and no closing held, at which time the certificates would have been delivered to the purchasers. Resch-Cassin and Nagler-Weissman had absolute control of the floating supply of the stock. With such control, they could offer to purchase the stock at increasingly higher prices, secure in the knowledge that they alone could sell any appreciable quantity. With such control, they would be protected against would-be short sellers who would eventually have to come to them for stock with which to cover.

Finally, the fourth factor mentioned, the collapse of the market for the security when the manipulator ceases his activity, also is present in the instant case. Once Nagler-Weissman stopped buying on December 7, 1970, the price of Africa dropped rapidly and within a few weeks fell from $17½ to $8 to $4, reaching $2 at the time of the trial of this action.

It is true, of course, that § 9(a)(2) of the Exchange Act requires that any manipulation be "for the purpose of inducing the purchase or sale of such security by others". Although defendants claim they were engaged in "normal trading", it seems clear that their transactions in Africa stock were designed to induce others to purchase the security. Here they were engaged in the distribution of the stock and obviously had the purpose of inducing the purchase of the security by others. They had an obvious incentive to artificially influence the market price of the security in order to facilitate its distribution or increase its profitability. Here the defendants used the manipulated after-market to sell the Africa stock to the public. Nagler-Weissman had sold 17,500 shares of the original issue to its own customers for which it had not yet been paid, and the likelihood of its customers' paying would be strengthened by a rising, rather than a falling, market. Forster and Weissman,

as well as Nagler-Weissman, had a profit motive in causing the price of the stock to rise: Forster through his purchase of 1,200 shares for his wife's account, Weissman through the $25,000 loan in his name used to purchase 2,500 shares, and Nagler-Weissman through its interest in closing the issue to assure its commissions as a member of the selling group.

■ Defendants claim they believed the issue was oversold and, in addition, that there was a heavy demand for Africa in the after-market. However, the Court finds that the defendants herein knew, or should have known, that all was not well. They must have known that the scheduled closing aborted on November 13 and on occasions thereafter. Nagler-Weissman, the prime market-maker, received few if any calls by brokers or customers interested in purchasing the stock. Weissman and Forster constantly visited the offices of Resch-Cassin during this period. The "attendant conditions were more than sufficient to put [them] on notice that something was wrong. Under such circumstances they were under a duty to investigate, and their violation of that duty brings them within the term 'willful' in the Exchange Act." Dlugash v. SEC, 373 F.2d 107, 109 (2d Cir. 1967).

All the classic elements of an over-the-counter manipulation are present in the instant case. The defendants presently before this Court engaged in a series of transactions in the common stock of Africa which created actual and apparent trading in, and raised the price of, that stock for the purpose of inducing its purchase by others. The apparent and actual trading was achieved with advancing pink sheet quotes, inducement of other brokers to enter quotes, and actual purchases. The price rise was effected by Nagler-Weissman's dominion and control of the market in the stock and total price leadership in both the sheets and actual purchase, as further evidenced by the virtual collapse of the market in the stock following the manipulation. The natural consequence of this course of conduct was to artificially stimulate the so-called market price of the stock while making it appear to be the product of the independent forces of supply and demand when, in reality, it was completely a creature of defendants' subterfuge. As stated in Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 794 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970):

"Section 9(a)(2) was aimed at preventing an individual from dominating the market in a stock for the purpose of conducting a one-sided market at an artificial level for its own benefit and to the detriment of the investing public."

The Court finds that the defendants manipulated the price of the common stock of Africa within the meaning of § 9(a)(2) of the Exchange Act and thus contravened § 10(b) of that Act and Rule 10b–5 thereunder.

■ While manipulative practices under § 9(a)(2) are themselves fraudulent, defendants also are guilty of other fraudulent practices. By December 6, 1970, if not before, Nagler-Weissman knew that it was, for all practical purposes, insolvent. Yet it continued to do business with the public on a "business as usual" basis. Even the closing of its doors on December 11, 1970, was carried out in a manner calculated to mislead its public customers. By engaging in transactions with the public, a broker-dealer certainly represents that it is solvent. In addition to a representation as to its solvency, a broker-dealer also impliedly represents that the price of a transaction is reasonably related to a price prevailing in a market that is free, open and competitive.

"The essential objective of securities legislation is to protect those who do not know market conditions from the overreachings of those who do. Such protection will mean little if it stops short of the point of ultimate consequence, namely, the price charged for the securities." Charles Hughes & Co. v. SEC, 139 F.2d 434, 437 (2d Cir.), cert. denied, 321 U.S.

786, 64 S.Ct. 781, 88 L.Ed. 1077 (1943).

After the sale of its allotment of 17,500 shares of Africa to the public, Nagler-Weissman had to receive payment for these shares. At the time payment was due, the defendants were engaged in a manipulation of the price of that stock and were under a duty to inform the purchasers that no attention should be paid to the market price in considering whether or not to complete the purchases. Accordingly, defendants Nagler-Weissman, Nagler and Weissman violated § 10(b) of the Exchange Act and Rule 10b–5 thereunder in that they misrepresented their financial condition to the public by continuing to deal with their customers at a time when Nagler-Weissman was insolvent, and in that they further misrepresented the state of the over-the-counter market in Africa stock to the public purchasers of that security.

Finally, on the issue of the defendants' violations of the anti-fraud provisions of the Securities Act and of the Exchange Act, the actions of Weissman and Nagler in conjunction with Resch-Cassin in disguising both Resch-Cassin's and Nagler-Weissman's dire financial plight clearly involved a fraudulent scheme in connection with the purchase or sale of securities. A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967). The suggestion to falsify the books of Resch-Cassin by creating a false sale of 25,000 shares of Africa stock to one Schwartz in Canada was made by Weissman and/or his attorney and concurred in by defendants. The clear intent of the suggestion was to set up a sham transaction for the purpose of deliberately misleading the public, and the regulatory bodies set up to protect the public, as to the financial condition of the firms.

### Violation of the Bookkeeping Rule

Defendant Nagler-Weissman also violated § 17(a) of the Exchange Act and Rule 17a–3, 17 C.F.R. § 240.-17a–3 (1971), thereunder and defendants Nagler and Weissman aided and abetted the violation of said section and rule. As a registered broker-dealer, Nagler-Weissman was subject to § 17(a) and Rule 17a–3, and defendants Nagler and Weissman, as the principals of Nagler-Weissman, were charged with the responsibility of insuring that their firm's books and records were kept and maintained in compliance with the requirements of the Exchange Act. The evidence clearly supports the charges, and the regulations are clearly reasonable and necessary in order for the Commission to protect the public investor. Boruski v. SEC, 340 F.2d 991 (2d Cir.), cert. denied, 381 U.S. 917, 928, 943, 944, 85 S.Ct. 1545, 14 L.Ed.2d 437 (1965). The testimony of Mr. Mink is replete with references to the "vast differences" existing in the records at the time of his inspection. The deliberate falsification of Resch-Cassin's books to reflect the Schwartz transaction, in which falsification Weissman played a prominent and knowing part, was itself a violation of the bookkeeping rule.

### Violation of the Net Capital Rule

Defendant Nagler-Weissman also violated § 15(c)(3) of the Exchange Act, 15 U.S.C. § 78o(c)(3) (1970) and Rule 15c3–1, 17 C.F.R. § 240.15c3–1 (1971), thereunder and defendants Nagler and Weissman aided and abetted the violation of said section and rule. Although the books and records of Nagler-Weissman, when inspected, were in such poor condition that an accurate analysis was impossible, there is ample evidence that Nagler-Weissman was in violation of the net capital rule early in December at the time the first check from Resch-Cassin "bounced". No later than December 6, 1970, it was clear that Resch-Cassin was insolvent, and when Resch-Cassin became insolvent, Nagler-Weissman, whose financial condition was dependent upon the financial stability of Resch-Cassin, also became insolvent.

The net capital rule is the principal rule prescribed by the Commission to insure the financial responsibility of broker-dealers. Blaise D'Antoni & As-

sociates, Inc. v. SEC, 289 F.2d 276, 277 (5th Cir.), cert. denied 368 U.S. 899, 82 S.Ct. 178, 7 L.Ed.2d 95 (1961). Rule 15c3–1 provides that no broker or dealer shall permit his aggregate indebtedness to exceed 2,000 per cent of his net capital. The Africa "fail to deliver" to Resch-Cassin was listed as a major asset by Nagler-Weissman from the time of the first sale of Africa by Nagler-Weissman to Resch-Cassin. After the closing on November 23, 1970, certificates were available for delivery, and upon delivery would have to be paid for. From the time the first Resch-Cassin check bounced the "fail to deliver" could no longer be considered an asset of Nagler-Weissman. Nagler and Weissman, by allowing their firm to sell so many shares of Africa to Resch-Cassin without regard to the latter's ability to pay for these shares, were responsible for Nagler-Weissman's violation of the net capital rule. SEC v. Barraco, 438 F.2d 97 (10th Cir. 1971).

Also, as clearly noted, after Resch-Cassin's condition became apparent to them, Nagler-Weissman, Weissman, and Nagler participated in the Schwartz transaction to camouflage that condition. Nagler and Weissman were the principals of Nagler-Weissman and were fully aware that they were staking their firm's very existence on the ability of Resch-Cassin to pay for over 30,000 shares of Africa, yet took no steps to insure that payment could be made. Their conduct not only resulted in a violation of the net capital rule but in their firm's insolvency as well, the very result the rule was designed to prevent.

Violation of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1970) and Rule 10b–6, 17 C.F.R. § 240.10b–6 (1971), thereunder.

 Rule 10b–6, promulgated by the Commission under authority contained in § 10(b) of the Exchange Act, provides in pertinent part as follows:

"(a) It shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10(b) of the act for any person,

"(1) who is an underwriter or prospective underwriter in a particular distribution of securities, or

"(2) who is the issuer or other person on whose behalf such a distribution is being made, or

"(3) who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution . . . ."

Rule 10b–6 defines certain conduct as manipulative per se. No further showing of manipulative intent is required to establish violations of the rule. The relevant portion herein is paragraph (a)(3), supra, which provides that a dealer who is participating in a distribution may not bid for or purchase the stock being distributed until after he has completed his part in the distribution. While it is true that Nagler-Weissman had disposed of its allotment of 17,500 shares prior to its commencement of trading Africa on October 27, 1970, it also is undisputed that it entered quotes in the pink sheets and became the price market-maker at the specific request of Resch-Cassin which was engaged in a distribution of the stock and which itself could not have legally entered the pink sheets. Accordingly, Nagler-Weissman was aiding and abetting a violation of Rule 10b–6. Dlugash v. SEC, supra, 373 F.2d 107; Winkler v. SEC, 377 F.2d 517 (2d Cir. 1967). Moreover, Forster actually purchased stock on behalf of Resch-Cassin while the latter was still conducting its underwriting of Africa and at a time when

Nagler, Forster and Weissman knew, or should have known, that the issue had not closed and that all was not well. Such conduct on their part was at least aiding and abetting Resch-Cassin in its violation of Rule 10b–6. SEC v. North American Research & Development Corp., 424 F.2d 63, 71 (2d Cir. 1970).

### Injunctive Relief

 In determining whether a permanent injunction should issue, the Court must determine "whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby." SEC v. Culpepper, 270 F.2d 241, 249 (2d Cir. 1959). Of course, all an injunction requires is that in the future the defendants obey the law. Moreover, "[t]he likelihood of future violations must be viewed in light of past conduct." SEC v. Northeastern Financial Corp., 268 F.Supp. 412, 414 (D.N.J. 1967); *see also* SEC v. Kamen & Co., 241 F.Supp. 430 (S.D.N.Y.1963). The Exchange Act does not contain any expression of legislative intent requiring a showing of specific fraudulent intent in order to violate its provisions. The only form of scienter required, in order for one to violate Rule 10b–5, is merely "lack of diligence, constructive fraud, or unreasonable or negligent conduct." SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833, 855 (2d Cir. 1968), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), reh. denied, 404 U.S. 1064, 92 S.Ct. 733, 30 L.Ed.2d 753 (1972).[11] No purpose would be served in further recitals of the activities of these defendants. The facts compel the conclusion that defendants knew what was happening, and if, in certain instances, they did not, such "innocence" can be attributed only to lack of diligence or negligence. Furthermore, by their actions, they made possible the fraudulent and manip-

ulative conduct of Resch-Cassin, and may be enjoined, under § 21(e) of the Exchange Act, as aiders and abetters. SEC v. Barraco, *supra*, 438 F.2d 97.

### Conclusions of Law

1. This Court has jurisdiction over the defendants and matters alleged as violations of law herein.

2. From on or about November 23, 1970, Nagler-Weissman has violated and Nagler and Weissman have aided and abetted violations of § 15(c)(3) of the Exchange Act and Rule 15c3–1 thereunder (net capital rule).

3. From on or about November 23, 1970, Nagler-Weissman has violated and Nagler and Weissman have aided and abetted violations of § 17(a) of the Exchange Act and Rule 17a–3 thereunder (bookkeeping rule).

4. From on or about October 23, 1970, Nagler-Weissman, Nagler, Weissman and Forster, singly and in concert, directly and indirectly, participated in a conspiracy that wilfully violated and wilfully aided and abetted violations of § 17(a) of the Securities Act and § 10(b) of the Exchange Act and Rule 10b–5 thereunder, in connection with the offer, purchase and sale of Africa common stock, in that:

(a) the defendants manipulated the over-the-counter market price for the common stock of Africa;

(b) the defendants failed to disclose to the public and other brokers the conduct described in paragraph 2, 3 and 4(a), *supra*; and

(c) the defendants Nagler-Weissman, Nagler and Weissman engaged in an artifice to defraud by instructing and advising Resch-Cassin to falsify its books and records in order to conceal the true state of the financial condition of both Resch-Cassin and Nagler-Weissman.

---

11. Since the instant case is a Commission enforcement action, there is no need to satisfy the higher degree of scienter required in private damage actions under Rule 10b–5. *See, e. g.*, Shemtob v.

Shearson, Hammill & Co., 448 F.2d 442, 445 (2d Cir. 1971). In any event, the actions of the defendant amount to more than "mere" negligence.

5. From on or about October 23, 1970, Nagler-Weissman, Nagler, Weissman and Forster, singly and in concert, directly and indirectly, participated in a conspiracy that wilfully violated and wilfully aided and abetted violations of § 10(b) of the Exchange Act and Rule 10b–6 thereunder in connection with the offer and sale of Africa common stock.

6. Nagler-Weissman, Nagler, Weissman and Forster made use of the means and instrumentalities of transportation and communication in interstate commerce and the mails while engaged in the illegal conduct described in paragraphs 2, 3, 4 and 5, *supra.*

7. The issuance of a permanent injunction is essential to protect the public against a repetition of the violations described in paragraphs 2, 3, 4 and 5, *supra,* by these defendants. Unless enjoined, there is a likelihood that they might continue to engage in violations of the federal securities laws.

Submit injunctive order in conformity herewith on five (5) days notice.