SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Robert SAYEGH, Defendant.

No. 89 Civ. 0572 (JFK).

United States District Court,
S.D. New York.

Nov. 21, 1995.

Securities and Exchange Commission, New York City (Edwin H. Nordlinger, Carmen J. Lawrence, Robert B. Blackburn, Anahaita N. Kotval, Bohdan S. Ozaruk, Wendy A. Lurie, Alistaire Bambach, Daniel R. Schnipper, of counsel), for plaintiff.

Franklin Ormsten, Jericho, New York, for defendant.

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEENAN, District Judge:

#### BACKGROUND

The United States Securities and Exchange Commission ("SEC") seeks to permanently enjoin the defendant Robert Sayegh ("Sayegh") from further alleged violations of Section 10(b) of the Securities Exchange Act ("Exchange Act") of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5). It also seeks an accounting to determine if Sayegh earned any profits from the alleged violations. A non-jury trial was held on the Commission's application for a permanent injunction for several days in November, 1994.

The SEC's complaint alleging trading violations in connection with the securities of Chase Medical was originally filed in this matter in early 1989. It was subsequently amended to add, among others, Sayegh, as a defendant and to include allegations of transactions in the shares, called American Depository Receipts ("ADRs") of the Institute of Clinical Pharmacology, PLC ("ICP"). The

Chase scheme, in which Sayegh was not involved, was a major event in causing the demise of Moore & Schley. (Tr. 180). Between $9 to $10 million was lost on the Chase transaction. Chase stock was manipulated by Militano, Sonneberg, Cranley and Core. (Tr. 744–745).

Essentially, the SEC alleges that Mr. Sayegh committed a series of fraudulent acts from approximately September, 1987 to March, 1989, the period at issue in this case. Among the alleged acts are that he:

1. artificially supported the price and controlled the supply of ICP, cf. p. 11–14 infra;

2. refused to accept sell orders in the stock, cf. p. 15 infra;

3. crossed trades in ICP for customers lacking margin, made unauthorized trades and promulgated false information, cf. p. 15–16 infra;

4. directed other broker-dealers to buy stock on Moore & Schley Cameron and Co's. ("Moore & Schley") behalf, cf. p. 17, 18 infra; and

5. parked shares of ICP in customer accounts of Vincent Militano ("Militano") and Milton Sonneberg ("Sonneberg") to avoid a capital charge on the firm's inventory, cf. p. 18 infra.

#### Findings of Fact

The defendant, Robert Sayegh ("Sayegh"), has held various jobs in the securities industry for 35 years. He had staff and supervisory positions with the NASD between 1959 and 1969. He resigned from the NASD in 1969 when he was an assistant secretary. (Tr. 894–95). Sayegh was a general partner of Moore & Schley during the period at issue. He was responsible for Moore & Schley's over-the-counter ("OTC") proprietary account and knew about trades in this account. Sayegh was at his desk from 7:00 a.m. to 5:00 p.m. each day, only leaving it for three or four minutes at a time. (Tr. 1039–40). Until the alleged violations by defendant in this case, his record was clean.

As the OTC trader, Mr. Sayegh submitted bid and ask prices for securities in which

Moore & Schley made a market and was in charge of their market making function. ("Stipulated Facts" ¶ 37 of Pretrial Order, Tr. 78). His compensation was on the basis of his retail production only.

Mr. Sayegh had two trading assistants, Jim Dyer ("Dyer") and Rick Jones ("Jones") between whom he sat at the trading desk. (Tr. 283, 465). Mr. Sayegh is currently employed by Stuart, Coleman & Co., a broker-dealer in the capacity of account executive servicing retail clients. (¶ 1 of Pretrial Order).

John J. Cranley Jr., ("Cranley") was, at all relevant times, the managing general partner of Moore & Schley and chairman of Moore & Schley's management committee. (Stipulated Facts ¶ 3, p. 8). Thomas Core, ("Core") was a general partner of Moore & Schley and was the branch manager of Moore & Schley's 45 Broadway, New York, New York office. (Stipulated Facts ¶ 4, p. 8; Tr. 464). Vincent Militano ("Militano") and Milton Sonneberg ("Sonneberg") were registered representatives employed by Moore & Schley at its principal office, 45 Broadway, New York City. They shared registered representative number 056. Militano and Sonneberg, collectively referred to as the 056 Group, pooled and divided their brokerage commissions.

Moore & Schley was a New York limited partnership. It was a broker-dealer registered with the SEC pursuant to Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act"), [15 U.S.C. § 78o(b) ] and was a member of the New York Stock Exchange ("NYSE"), the American Stock Exchange ("AMEX"), the National Association of Securities Dealers ("NASD") and the Philadelphia Stock Exchange.

Institute of Clinical Pharmacology, ("ICP") was an Irish corporation whose ordinary shares were not registered in the United States. The shares were held primarily by corporate insiders. ICP ADRs were traded through the NASD's inter-dealer quotation system, NASDAQ. ICP conducted clinical tests of pharmaceutical substances and collected data in studies done to investigate the effects of the substances on human. beings. (Stipulated Facts ¶ 7, pp. 9–10).

In November 1984, Moore & Schley co-underwrote with Stephens, Inc. ("Stephens"), an initial public offering of 1,000,000 ICP ADRs, with an option for an additional 150,-000 ADRs to cover over-allotments. The ADRs were priced at $7.75 each and as part of the initial public offering, Moore & Schley placed approximately 500,000 ICP ADRs with its retail accounts. (Stipulated Facts ¶¶ 9–10, pp. 9–11; Tr. 27, 28). In addition to the ADRs offered in the initial public offering, ICP insiders, Dr. Austin Darragh, John Murphy and Dr. Ian Brick ("Brick"), owned four million Irish ordinary shares. (Tr. 31). Following the initial public offering, Moore & Schley and Stephens became the primary market makers for the ICP ADRs, and Cranley became a director of ICP. (Stipulated Facts ¶ 11, p. 11; Tr. 95). Stephens terminated its role as an active market maker in ICP ADRs in July 1986. (Stipulated Facts ¶ 79, p. 21).

Moore & Schley hired Messrs. Militano and Sonneberg in 1986. (Stipulated Facts ¶ 92, p. 23, Tr. 89–90). By this time, Moore & Schley already had a significant position in ICP. (Tr. 467).

Militano and Sonneberg were hired to operate as cold callers. A cold caller seeks to get business from people he does not know. Cold calling has certain risks associated with it including that (i) customers may buy securities and never pay for them, (ii) cold callers might execute unauthorized transactions to support the price of a stock, (iii) cold callers might churn accounts to generate commissions, and (iv) cold callers could give payment extensions if their customers do not pay for trades placed in their accounts. (Tr. 467–68, 526, 528–29). When Militano and Sonneberg were hired, Moore & Schley took measures to guard against the risks associated with cold calling including appointing the then in-house counsel to supervise them. (Tr. 468–556). Besides ICP, Moore & Schley had problems with the stock of another company, Chase Medical (supra, p. 2).

Militano, Sonneberg, Cranley and Core were formally charged with manipulating the shares of Chase Medical ("Chase") an American Stock Exchange ("AMEX") listed securi-

ty. None of them contested the SEC's civil allegations and Militano and Sonneberg pleaded guilty in Federal Court to securities laws violations involving Chase. The Court concludes that the Chase manipulation was key to the demise of Moore & Schley (Tr. 180). Between $9 to $10 million was lost on Chase. Chase stock was manipulated by Militano, Sonneberg, Cranley and Core. There is no proof that Sayegh had anything to do with the Chase manipulation. (Tr. 744–745). In connection with the Chase scheme, Sonneberg and Militano consented to the entry of final judgments of permanent injunction as did Core and Cranley. Both Militano and Sonneberg pleaded guilty to criminal violations of law in connection with the Chase/ICP scheme. Militano also pleaded guilty to obstruction of justice charges and both he and Sonneberg agreed to cooperate with the Government and to be truthful in the hope of receiving a lighter sentence. (Tr. 661–663, 678, 697, 723, 776, 777).

Moore & Schley was required by Rule 15c3–1 [17 C.F.R. § 240.15c3–1], to maintain a level of net capital above an applicable minimum, (Stipulated Facts ¶ 94, p. 23; Tr. 388) to ensure that sufficient liquid assets were available to meet obligations to customers and other dealers. (Tr. 436–37). When a broker-dealer's net capital falls below the applicable minimum, the firm is required to cease operating its business. (Tr. 388). Net capital is defined in Rule 15c3–1 as net worth after certain prescribed adjustments. Among the adjustments to net worth required to compute net capital, a broker-dealer must deduct a percentage, known as a "haircut," from the market value of securities held as assets in its proprietary account. (Stipulated Facts ¶ 95; p. 23). A haircut is a net capital charge assessed on a firm's proprietary position due to market risk. As a firm's position in a security increases, the haircut will increase. (Tr. 403; 423). If the equity in a customer margin account becomes deficient, the amount of the deficit is charged against the firm's net capital. (Stipulated Facts ¶ 23, p. 13). A broker-dealer must also deduct from its net worth the value of all assets, including securities in its proprietary account, which are not readily convertible into cash. (Stipulated Facts ¶ 96, p. 24).

Moore & Schley filed "FOCUS" reports with the NYSE on a monthly basis. (Stipulated Facts ¶¶ 24–25, 98 pp. 13, 24; Tr. 385). In preparing the monthly FOCUS report, Moore & Schley was required to calculate its net capital position. (Stipulated Facts ¶ 26, p. 13). During 1987 and 1988, Moore & Schley experienced net capital problems, often maintaining a level of net capital that was very close to the minimum amount required to stay in business. (Tr. 386). The firm's net capital was discussed at Monday night partnership meetings which Sayegh attended in 1987 and 1988. FOCUS reports and other data relating to the firm's financial condition and performance were distributed and discussed at these meetings. (Tr. 83–84, 163–64).

Sayegh knew of Moore & Schley's weak financial condition, and he made a $100,000 capital contribution to Moore & Schley in 1987 to eliminate the deficit in his capital account arising from significant losses experienced by the firm. (Stipulated Facts ¶ 20, p. 13).

From October 1987 through August 1988, Moore & Schley maintained a large position in ICP ADRs in its proprietary account. This consumed a significant portion of the firm's capital. (Stipulated Facts ¶ 99(a), p. 24; Tr. 416–17); Sayegh 3/24/92 Deposition, PX 563 at p. 97). At month's end, between August 1987 and December 1988, Moore & Schley customer accounts held between 457,038 and 685,863 ICP ADRs. (PX 322). From October 1987 through the end of 1988, the size of the ICP position at Moore & Schley was a continuing problem for the firm. The partners, including Sayegh, attempted to broaden the interest in ICP in an effort to reduce the firm's position in the ICP ADRs. (Tr. 124, 161, 196–98; Plaintiff Exhibit 563 at pp. 92–94, 114–115; Tr. 1068; Stipulated Facts ¶¶ 15, 103, pp. 11, 25). These efforts were not successful. (Tr. 100).

From August 1987 to December 1988, ICP was thinly traded. There was little interest in ICP outside Moore & Schley. (Deposition of Cuyler Kline ("Kline Deposition"), PX 533 at pp. 21–27; Tr. 223; 613; 35; 1138–40). Moore & Schley was the only active market

maker in ICP (Tr. 512–13) once Stephens dropped out.

Moore & Schley overstated its net capital in its FOCUS reports when it failed to deduct from its net capital that portion of its ICP position that was not readily convertible into cash. (Tr. 418, 428). Between January and April 1988, inclusive, Moore & Schley's net capital position, adjusted for that portion of the firm's ICP position that was not readily convertible into cash, reflected net capital deficits ranging from approximately $500,000 to $780,000. (Tr. 424–28; PX 330–333). During that period, because of its ongoing net capital problems, Moore & Schley requested, and Securities Settlement Corp. ("SSC") agreed to defer Moore & Schley's ticket charges, of approximately $10 to $15 per stock transaction cleared by SSC. (Tr. 398, 470; PX 527, p. 52). SSC was a broker-dealer registered with the SEC pursuant to Section 15(b) of the Exchange Act which cleared and settled securities transactions for Moore & Schley. (Stipulated Facts ¶ 8). In May 1988, to alleviate the firm's net capital problems, Moore & Schley received a subordinated loan of $2.5 million from SSC. Stipulated Facts ¶ 21, p. 13; Tr. 469).

Moore & Schley would have been below the minimum excess net capital without the subordinated loan. (PX 76; Tr. 397, 400). Because the firm's margin accounts contained so much ICP, Moore & Schley faced the possibility of a so-called "crater" effect in response to a drop in ICP's price. A decrease in price would have created margin deficits, and if customers did not put additional money into their accounts ICP would have had to be sold. There was no market for ICP so sales of ICP would have resulted in a further drop in price and the supply of ICP would have quickly exceeded demand. (Tr. 614, 696, 697, 1191–96, 1235–36; PX 312). Moore & Schley's future was linked to the price of ICP ADRs and the Court concludes that Mr. Sayegh was well aware of this. It is true, however, that he did not receive any direct special compensation from transactions involving the ICP ADRs.

A drop in ICP's price would have reduced the value of the ICP position in Moore & Schley's proprietary accounts and its net capital. Additionally, the equity in customer margin accounts containing ICP would have been reduced and, to the extent such reductions resulted in deficits, such deficits would have been charged to Moore & Schley's net capital. (Stipulated Facts ¶ 23, p. 13). This would have put Moore & Schley out of business. (Tr. 137, 614; 670–71).

Moore & Schley partners, including Sayegh, knew the consequences that would result from such a drop in the price of ICP. (Tr. 137, 476–77, 512–13). The partners knew that the price of ICP ADRs would drop if Moore & Schley did not continue supporting ICP. (Tr. 137; 512–13; 617–19). The evidence supports the conclusion that Sayegh, together with Cranley, Core, Militano and Sonneberg, were participants in a scheme to support the price of ICP during the time in issue. Each of them participated in a different way and attended several meetings to accomplish the purpose of supporting ICP's price. (Tr. 136, 511, 704, 736, 1030–1034).

All the orders for ICP went through Sayegh's desk and he had sole authority to make trades in the firm account. (Tr. 511–12; PX 561, p. 23). Militano and Sonneberg were responsible for warehousing as much ICP as possible. Cranley and Core were responsible for handling margin calls and liquidations with SSC. (Tr. 705–06, 736).

Militano and Sayegh agreed that when Sayegh acquired too much ICP, Militano would take the stock off his hands. In return, Sayegh promised to raise the price of ICP. (Tr. 663–64). When Sayegh asked Militano to "put away stock," Militano understood that Sayegh was asking him to warehouse the stock in customer accounts until a legitimate buyer was found. Between October 1987 and January 1989, Militano put away more than 200,000 ICP ADRs. (Tr. 665).

Sayegh was the price leader for ICP from October 1987 through December 1988. (PX 314, 315). During this period, Sayegh posted the high bid for ICP on 271 of 313 trading days and posted the exclusive high bid on 169 days. During the same period, Sayegh posted the high offer/ask on 270 of 313 trading

days and posted the exclusive high offer/ask on 169 of those days. He posted the low offer/ask on but 8 of the 313 days. (Tr. 158, 836, 837; PX 314). This was a signal to the marketplace that he had an interest in buying ICP ADRs but no great desire to sell. (Tr. 840; 1177, 1201–22). Between January 19 and February 28, 1988, when Sayegh lowered Moore & Schley's bid, within minutes, other market makers lowered their bids and fell in behind Moore & Schley's restated bid. (PX 315; Tr. 844–45).

Between October 1987 and December 1988, Sayegh purchased for the trading account more than half of all ICP shares offered on the open market. During this period, Sayegh rarely sold ICP shares into the open market. (PX 320; Tr. 1120). During this period, Moore & Schley's trading in ICP accounted for 90% of all NASDAQ volume in ICP ADRs. This trading volume demonstrates Moore & Schley's domination, control and manipulation of the market in ICP. (Tr. 1216–19; PX 321).

The October 1987 stock market crash serves to point-up Mr. Sayegh's manipulation of the price of the ICP ADRs. On October 19, 1987, the Dow Jones Industrial Average dropped 508 points, a falloff of 22.6%. The NASDAQ composite index for the OTC market fell 46.12 points, a drop of 11.4%. Stocks were estimated to have lost more than $500 billion in equity value. (Stipulated Facts ¶ 38, p. 15).

Sayegh artificially supported the price of ICP at $16¾ during and following the October 19 stock market crash. (Tr. 115–18; Tr. 1034). He purchased, in the open market, the number of ICP shares necessary to maintain the price of ICP at $16¾ with the understanding that Militano would place the shares in his customer accounts. As a result, the price of ICP barely dropped during the crash. (Tr. 114; 678–79).

On the day of the stock market crash, Moore & Schley purchased, for its proprietary account, 42,900 ICP ADRs, and sold 7,500 ICP ADRs to 056 Group customer accounts, for net purchases of 35,400 ICP ADRs. (PX 42). By absorbing 35,400 ICP ADRs at approximately $17 per ADR, Sayegh maintained the price of ICP in the face

of the crash. (Tr. 1208–11, 1215). Between October 16, 1987 and October 28, 1987, the closing high bid price for ICP declined $.50 from $17.25 bid to $16.75 bid, a drop less than 3%. (Stipulated Facts ¶ 42, p. 16). On October 19, 1987, the highbid for ICP ADRs was $17, a drop of only $.25 (1.4%) from the closing high bid on October 16, 1987, the previous trading day. (Stipulated Facts, ¶ 39, p. 16).

In November 1987 Dr. Ian Brick (cf. p. 5 supra) ended his relationship with ICP. When Brick sought to sell ICP ADRs in the open market in early 1988 Sayegh, to limit the supply of ICP, engineered a complicated scheme to drop the price of ICP so as to dissuade Brick from selling his ICP ADRs in the open market. (Stipulated Facts 47, 49, 54). Because Moore & Schley could unilaterally reduce the price of ICP shares in the open market, Brick stopped offering the ICP shares in the market. (Tr. 52). The Court concludes that Sayegh was a prime participant in this scheme. (Tr. 51, 52, 62, 1154–1156). The activities relating to the Brick shares evidence Sayegh's manipulation of the price of ICP shares in the open market.

Sayegh also supported the price of ICP in the face of poor corporate earnings. On June 9, 1988, ICP announced a loss of $4,792,000 or $.93 per ADR for the year ended December 31, 1987, Sayegh maintained his then current ICP bid and the price of ICP ADRs remained firm. (Tr. 1236–1248). Sayegh could not sell the ADRs on the open market without depressing the price of ICP and he did not want to increase the ICP position in Moore & Schley's proprietary account. (Tr. 273; 483–85; 691–92). To artificially withhold supply of ICP from the market, between October 1987 and January 1989, Sayegh discouraged Moore & Schley brokers from selling ICP. (Tr. 199, 481; 690). Sayegh himself refused to execute customer sell orders. (Tr. 222–23; 481–85, 690) and he knew that this refusal to execute customer sell orders was improper. (Tr. 485–86).

A cross trade occurs when shares are sold from one customer and bought by another customer within the same broker-dealer.

(Tr. 87, 472). When a Moore & Schley customer did not pay for a transaction, the security was generally sold into the open market. This was not so with ICP ADRs. When Militano customers did not pay for ICP ADRs placed in their accounts, the ADRs were crossed into the account of another non-paying customer, instead of liquidating the stock on the open market. (Tr. 472, 668, 669). Sayegh executed cross trades in ICP ADRs among Group 56 customers to avoid open market liquidations of ICP in response to margin and Reg. T calls. (Tr. 474–78).

The Court does not accept Sayegh's denial that he was aware of the ICP cross trades between May 17, 1988 and November 25, 1988. Among other considerations militating this finding were the large number of cross trades executed, Sayegh's overall responsibilities and his physical location at the trading desk.

Sayegh was responsible for executing, or reviewing, cross trades in OTC securities at Moore & Schley during 1987 and 1988, and for reporting these trades to the NASD. (Tr. 472–73, 558; Tr. 673; Stipulated Facts ¶ 36, PX 561 pp. 40, 147). An ICP cross trade could not be executed without going through the order desk. (Tr. 87–88; 675). Sayegh concedes that he knew about all cross trades executed before May 17, 1988 and after November 25, 1988. (Tr. 1086). His denial of knowledge between those dates is not credible.

When order tickets from cross trades were handed to one of his two trading assistants, Sayegh knew of the trades because he sat between his two assistants. (p. 4 supra).

Five hundred thirty-six thousand ICP shares were crossed in 309 transactions between November 1987 and December 22, 1988. (Stipulated Facts ¶ 120).

Sayegh knew that he was required to report cross trades to the NASD, (Sayegh 3/2/89 Deposition, PX 561, p. 236; Tr. 1086), but Moore & Schley failed to report 172 cross trades covering 385,200 ICP ADRs. (Defendant Exhibit Q).

On December 27 and December 28, 1988, Sayegh executed cross trades for 323,000 ICP ADRs between Moore & Schley customer accounts. (Tr. 503; Stipulated Facts ¶ 72, p. 20). He knew that the crosses were executed to isolate ICP ADRs from accounts holding Chase Medical Group Inc. ("Chase Medical") common stock with outstanding Reg. T calls. (Tr. 505–06, 524; 688; Sayegh 3/24/92 Deposition, PX 563 at p. 148). Those accounts into which ICP was crossed on December 27 and 28, 1988 did not have the money to pay for the trades (Tr. 689).

Core did not approve these cross trades, but Sayegh directed his assistants to place Core's initials on the order tickets. (Tr. 504–05, 507; Sayegh 3/2/89 Deposition, PX 561 pp. 133–34).

The effect of the December 1988 cross trades in ICP was to artificially withhold ICP ADRs from the open market. (Tr. 1141).

"Bearding" is a technique employed by stock traders to disguise their true interest in a security or to create the appearance of heightened strength in the marketplace. (Tr. 79; 237). In 1987 and 1988, Sayegh employed two ICP market makers, Hill, Thompson, Magid & Co. ("Hill Thompson") and Baird, Patrick Co. ("Baird Patrick"), as "beards" in trading ICP to create the illusion of strength and widespread market interest in ICP. (PX 315; Tr. 109, 237, 507–10, 587, 692–93). Sayegh would instruct Hill Thompson and Baird Patrick to raise their bids for ICP ADRs. (Tr. 510–11, 587–88, 596; 692–93; 135–36, 226, 228–29, 335–37, 590–11, 587–588, 642–643). Militano testified that he heard Sayegh direct Hill Thompson to raise its bid and then watched on the trading screen as Hill Thompson actually moved up its price. (Tr. 694–96). Sayegh told the beards that if they were offered ADRs, they were authorized to purchase up to a stated number and he would take those ADRs from them at the end of the day at no loss. (Tr. 337–38; 508–09, 596). There were 20 days between August 1987 and December 1988 on which Hill Thompson or Baird Patrick placed the high bid in ICP ADRs. (Tr. 868–69; PX 325). Between January 8 and December 29, 1988, Hill Thompson purchased 14,711 ICP ADRs and sold 12,511 of them to Moore & Schley. (DX N).

Sayegh's bearding arrangements with Hill Thompson and Baird Patrick constituted an improper attempt to influence artificially the price of ICP. (Tr. 1223–24, 1228–30).

In August 1988, Sayegh and Cranley asked Militano and Sonneberg to warehouse 210,000 ICP shares in 056 Group customer accounts. This transaction was to be a temporary measure while Moore & Schley sought legitimate buyers for ICP. (Tr. 130–31, 318–19, 684–85). Sayegh knew that Militano's customers were unlikely to pay for these ICP shares. (Tr. 498–99).

Moore & Schley sold these ADRs from its proprietary accounts at $11 per ADR to 056 Group customers without crediting any sales commissions to the 056 Group. (Stipulated Facts ¶ 69, p. 19; PX 318). Militano and Sonneberg received no commission on these transactions in an effort to offset losses sustained from the February cancel/rebill and the purchase of the Brick ADRs at a discount. (Tr. 308–09, 314, 685, 687).

By engaging in the activities described above and participating with Cranley, Core, Militano and Sonneberg, Sayegh maintained the price of ICP ADRs at artificially high levels from the fall of 1987 through early 1989.

### Conclusions of Law

■ The facts lead to the inescapable conclusion that Sayegh violated § 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 thereunder (17 C.F.R. § 240.10b–5). Section 10(b) and Rule 10b–5 prohibit fraudulent conduct "by the use of any means or instrumentality of interstate commerce or of the mails," and prohibits, in connection with the purchase or sale of any security, the use of "any manipulative or deceptive device or contrivance." Sayegh's activities used "the means" and "instrumentalit(ies) of interstate commerce," and "of the mails."

■ Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a) ] makes it unlawful to engage in manipulative activities with respect to securities registered on a national securities exchange. When manipulative conduct is engaged in with respect to an OTC security, that conduct violates § 10(b) of the Exchange Act and Rule 10b–5 thereunder. *SEC v. Resch–Cassin & Co.*, 362 F.Supp. 964, 975 (S.D.N.Y.1973). The S.E.C. has proven by a preponderance of the evidence that Sayegh by using the means or instrumentalities of interstate commerce and the mails, in connection with the purchase or sale of a security traded in the OTC market, with scienter, effected a series of transactions that created actual or apparent active trading in the security, or raised or depressed the price of the security, and that these transactions operated as a fraud or deception on the market for the security at issue, the ICP ADRs. *Aaron v. SEC*, 446 U.S. 680, 695–96, 100 S.Ct. 1945, 1955–56, 64 L.Ed.2d 611 (1980); *SEC v. C.M. Joiner Leasing Corporation*, 320 U.S. 344, 355, 64 S.Ct. 120, 125, 88 L.Ed. 88 (1943); *Crane v. Westinghouse Air Brake Co.*, 419 F.2d 787, 795–96 (2d Cir.1969), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *United States v. Charnay*, 537 F.2d 341, 350 (9th Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 528, 50 L.Ed.2d 610 (1976); *SEC v. Graystone Nash Inc.*, 820 F.Supp. 863, 870–72 (D.N.J.1993), *rev'd on other grounds*, 25 F.3d 187 (3d Cir.1994); *Resch–Cassin*, 362 F.Supp. at 975. *In re Michael Batterman*, 46 S.E.C. 304 (1976) sets forth the elements of a § 9(a) violation which have been met here.

Sayegh set Moore & Schley's bids and offers for ICP, executed ICP ADR purchase and sale transactions for both Moore & Schley firm and customer accounts and set Hill Thompson's and Baird Patrick's bids for ICP, as well as directed their purchases of ICP on Moore & Schley's behalf. At the relevant times, ICP ADRs were traded in the OTC market through the NASD's NASDAQ system. Thus, Sayegh's conduct occurred in connection with the purchase or sale of ICP ADRs.

■ Scienter involves an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Aaron*, 446 U.S. at 695–96, 100 S.Ct. at 1955–56. Scienter may be established by proving conduct that was knowing, intentional, or reckless, as opposed to merely negligent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d

1124, 1128 (2d Cir.1994); *SEC v. Hasho,* 784 F.Supp. 1059, 1107 (S.D.N.Y.1992). The evidence is most persuasive that Sayegh knowingly or recklessly participated in the manipulation of ICP ADRs. He was aware that a decline in the price of ICP would have had a substantial negative effect on Moore & Schley's net capital position. He knowingly took affirmative steps to maintain the price of ICP. Sayegh posted high bids for, and aggressively purchased, ICP ADRs on behalf of Moore & Schley from October 1987 through December 1988. This was despite knowledge that these bids and purchases were not based on any true firm or customer demand. Sayegh executed cross trades to avoid liquidations of ICP resulting from Reg. T violations. Sayegh requested Militano and Sonneberg to place ICP in their customers' accounts, knowing that the customers were not going to pay for the trades. He used other market makers to post bids and make purchases on behalf of Moore & Schley to create the appearance in the open market that there was a demand for ICP. Sayegh discouraged ICP sales into the open market by Moore & Schley brokers and by Brick. Sayegh was fully aware of the consequences of his actions. He acted with scienter.

There is no question but that Sayegh's conduct between September 1987 and the beginning of 1989 involved a series of transactions in ICP ADRs which included the following:

(1) placing Moore & Schley's bids and offers for ICP;

(2) buying and selling ICP ADRs for both Moore & Schley's firm and customer accounts;

(3) directing Baird Patrick and Hill Thompson, the "beards," to adjust their ICP bids and offers; and

(4) directing Baird Patrick and Hill Thompson to make purchases of ICP for which he would reimburse them.

Sayegh created actual trading activity by purchasing the vast majority of shares of ICP traded through NASDAQ for Moore & Schley's OTC trading account from October 1987 through December 1988. During this period, Moore & Schley accounted for 90% of the NASDAQ volume in ICP ADRs. These purchases created a distortion of the market picture and deceived investors as to real demand for the ICP ADRs. *Crane,* 419 F.2d at 793. Moore & Schley had no true interest in increasing its ICP position. Sayegh was warehousing the ADRs in customer accounts knowing the customers would not pay for the purchase.

The Sayegh transactions created apparent active trading in the ICP ADRs as well as the actual trading set forth immediately above. Sayegh created apparent activity by posting consistently high bids during the period of the manipulation. This created the appearance that there was a great demand for ICP in the marketplace. Between October 1, 1987 and December 30, 1988, Sayegh posted the high bid for ICP on 271 of 313 trading days and posted the exclusive high bid on 169 days. During the same period, Sayegh posted the high offer on 270 of the 313 trading days and posted the exclusive high offer on 169 of those days. Sayegh posted the low offer on only 8 of the 313 days. (Supra p. 12).

He used Hill Thompson and Baird Patrick as "beards" to stimulate market interest in the ADRs. He did not disclose the arrangement to investors in the marketplace. By using Hill Thompson and Baird Patrick to post bids for ICP, Sayegh created apparent trading activity in ICP ADRs.

The defendant further created apparent trading activity through his scheme to withhold the supply of ICP ADRs from the market. He refused to execute customer sell orders for ICP ADRs. He had Militano and Sonneberg warehouse in their customer accounts all ICP ADRs he acquired for Moore & Schley's proprietary account. He participated in executing hundreds of thousands of cross trades. He dropped the price of ICP to prevent Dr. Brick from selling his shares on the open market.

It is clear from the evidence that Sayegh's actions artificially supported the price of the ADRs. From October 1, 1987 through December 30, 1988, he was the price leader for ICP and posted the high bid repeatedly during the period. As pointed out at p. 12 above, from October 1987 through December

1988, the defendant purchased more than half of all the ICP ADRs offered on the open market and rarely sold ICP shares during the period. The cross trading and handling of the Brick shares also served artificially to support the price of the ADRs.

Sayegh's participation in the scheme to manipulate the price of ICP ADRs by limiting the available supply, consistently posting the high bid, executing the cross trades, causing shares to be placed in non-paying accounts to avoid open market liquidation, and using other market makers to create the illusion of an active market in the stock, without disclosing these details to the members of the investing public, operated as a fraud or deceit on the market. *Resch–Cassin*, 362 F.Supp. at 978–79, teaches that when a manipulation artificially raises or supports the price of a security, the sale of the security by the manipulator at a price which is the result of the manipulation, operates as a fraud.

■ In deciding whether to issue a permanent injunction in view of past violations, the Court must determine whether there is a reasonable likelihood that the wrong will be repeated unless enjoined. *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 99 (2d Cir.1978); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). The facts in this case show that Sayegh knowingly violated Section 10(b) of the Exchange Act by participating in the manipulation of ICP ADRs.

Sayegh's violations were knowing and egregious. Sayegh accomplished the manipulation by buying and having other market makers buy ICP ADRs while withholding their supply from the market.

These violations were not isolated, but went on for over 17 months while the price of ICP ADRs was maintained at an artificial level.

Mr. Sayegh has not shown or acknowledged a recognition of the wrongful nature of his actions. His denials are not credible in light of the magnitude of Moore & Schley's financial problems and the recurring ICP related issues. The facts show that Sayegh generated and participated in much of the conduct contributing to the manipulation. He knew and approved of the activities of the 056 Group, which also contributed to the manipulation. He fails to recognize the significance of his wrongful conduct and this gives rise to serious doubts about his future ability to refrain from engaging in such conduct. Sayegh is currently employed in the securities industry and it appears that his occupation will present opportunities for future violations of the securities laws. An injunction issues in the form annexed as Exhibit "A."

■ On the issue of disgorgement, the appropriate measure is the economic benefit Sayegh derived from his fraud. The Commission has been unable to determine this amount, if any. A definitive accounting from Sayegh setting forth any economic benefit he derived in the form of the commissions and trading profits relating to transactions in ICP ADRs is required.

The Court orders that an audit be performed and an accounting take place and be submitted to the Court by no later than January 15, 1996. The audit shall be performed by a C.P.A. firm chosen by the S.E.C., not by S.E.C. accountants. The amount of any disgorgement will be determined by the results of the accounting and the question of prejudgment interest will be resolved at that time.

**SO ORDERED.**

### Exhibit A

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Defendant Robert Sayegh be and hereby is permanently enjoined and restrained from, directly or indirectly, singly or in concert, by the use of any means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange:

(a) employing any device, scheme or artifice to defraud;

(b) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b–5 thereunder [17 C.F.R. § 240.10b–5].

**SO ORDERED.**

Dated: New York, New York
   November 21, 1995

     /s/ John F. Keenan
     JOHN F. KEENAN
     U.S.D.J.